379 F.3d 654
 William H. POULOS; Brenda McElmore; Larry Schreier, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
CAESARS WORLD, INC.; Sigma Game, Inc.; International Game Technology; Argosy Gaming Co., Aztar Corporation; Bally Entertainment; Boyd Gaming Corporation; Boyd Mississippi; Casino America; Casino Magic Corporation; Circus Circus Enterprises, Inc.; Claridge at Park Place; Elsinore Corporation; Gold Mine Casino; Gold River Hotel & Casino Corporation; Grand Casinos, Inc.; Harrah's Entertainment, Inc.; Hilton Hotels Corporation; Hollywood Casino; Hyatt Hotels Corporation; Lady Luck Gaming Corporation; M G M Grand, Inc.; Mirage Resorts, Inc.; Players International; Players Riverboat Casino; Primadonna Resorts, Inc.; Princess Hotels International; Rio Suite Hotel and Casino; Sands Regent Hotel & Casino; Sante Fe Gaming Corporation; Station Casinos, Inc.; Trump Organization; Union Plaza Hotel & Casino; Atlantic City Coin & Slot Service; Delta Diversions; Sodak Gaming; Monarch Casino & Resort, Inc.; Resorts International; Showboat, Inc.; Trump Castle Hotel & Casino; Trump Taj Mahal Corporation, Defendants-Appellees.
 No. 02-16604.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted January 15, 2004.
 Filed August 10, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED David Boies, Karen C. Dyer, David A. Barrett, Caryl L. Boies, Boies, Schiller & Flexner LLP, Armonk, NY, for the plaintiffs-appellants.
 David N. Frederick, Dennis L. Kennedy, Stephen R. Hackett, Lionel Sawyer & Collins; James J. Pisanelli, Schreck Brignone Godfrey; and William E. Cooper, Cooper Law Offices, Las Vegas, NV, for the defendants-appellees.
 Appeal from the United States District Court for the District of Nevada; Roger L. Hunt, District Judge, Presiding. D.C. No. CV-94-01126-RLH.
 Before: WALLACE, McKEOWN, and CALLAHAN, Circuit Judges.
 McKEOWN, Circuit Judge:
 
 
 1
 This permissive interlocutory appeal comes to us from a denial of class certification in a lawsuit involving the gaming industry. Proposed class representatives, William H. Poulos, Brenda McElmore, and Larry Schreier ("Class Representatives"), challenge an alleged "scheme to defraud patrons of gambling casinos" by a group of over sixty gaming machine manufacturers and the casino and cruise ship operators that use the machines ("the Casinos"). The proposed classes encompass nearly everyone who has played video poker or electronic slot machines within the last fifteen years. We take this opportunity to clarify the extent to which a class action plaintiff must establish individualized reliance to meet the causation requirement of a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claim predicated on mail fraud — an issue that bears heavily on a plaintiff's ability to meet the predominance and superiority requirements of class certification under Federal Rule of Civil Procedure 23(b)(3).[1] We conclude that the Class Representatives, like all plaintiffs asserting civil RICO claims, must prove individualized reliance where that proof is otherwise necessary to establish actual or proximate causation. Because the district court did not abuse its discretion in determining that individualized causation issues would predominate in this case, and no presumption of reliance applies, we affirm the denial of class certification.
 
 
 2
 Apart from the class certification issue properly before us on a discretionary appeal under Rule 23(f), the Casinos test the bounds of our pendent appellate jurisdiction by inviting us to review the district court's denials of their motions purporting to challenge the district court's jurisdiction over the underlying action. Their challenges are based on Burford abstention, the primary jurisdiction doctrine, and the district court's personal and subject matter jurisdiction over subgroups of the Casino defendants. We address subject matter jurisdiction as a threshold matter. However, we dismiss for lack of jurisdiction the remainder of these claims, none of which is "inextricably intertwined with" or "necessary to ensure meaningful review of" the class certification decision. Swint v. Chambers County Comm'n, 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995).
 
 BACKGROUND
 
 3
 Procedural History. After nearly ten years of judicial wrangling spanning several judges and an over seventy-page civil docket, a brief explanation of the proceedings is helpful to understanding the current posture of the case.
 
 
 4
 The underlying action involves two groups of defendants — 1) the "cruise ship defendants" which operate the machines in international waters, and 2) the remaining defendants, the so-called "land-based defendants." In 1996, Poulos's cases against both groups of defendants were reassigned from Judge Lloyd D. George of the United States District Court for the District of Nevada to Judge David A. Ezra, who was visiting from the District of Hawaii. A year later, the Poulos cases were consolidated, along with a third case filed by Schreier in Nevada in 1995. While Judge Ezra was assigned to these consolidated cases, the Class Representatives filed a Second Consolidated Amended Complaint and Jury Demand (the "complaint"), the operative pleading in this case, and the renewed Motion for Class Certification at issue here. The Casinos filed a flurry of jurisdiction-related attacks on the action — most of which Judge Ezra resolved in favor of the Class Representatives and the Casinos raise again here.
 
 
 5
 In April 2002, after Judge Ezra had held a hearing on the renewed Motion for Class Certification, but while the motion was still pending, the action was again reassigned — this time to the then recently-appointed Judge Roger L. Hunt. Judge Hunt denied the Representatives' renewed motion, effectively halting the proposed class action. We granted the Class Representatives permission to appeal pursuant to Rule 23(f), which permits a discretionary appeal from a district court order denying class action certification.
 
 
 6
 The Lawsuit. On behalf of themselves and two proposed classes, the Class Representatives bring six claims against the Casinos arising out of the Casinos' alleged "scheme to defraud patrons of gambling casinos." The three RICO claims are based on violations of 18 U.S.C. § 1962(a)(prohibiting investment or improper use of money obtained from racketeering activity), § 1962(c) (prohibiting association with an "enterprise" engaged in racketeering activity), and § 1962(d) (prohibiting the act of conspiring to violate 18 U.S.C. § 1962(a) or 1962(c)). The predicate act underlying the RICO claims is the Casinos' alleged violation of the mail fraud statute, 18 U.S.C. § 1341. The Class Representatives also assert claims based on common law fraud and deceit, unjust enrichment, and negligent misrepresentation.
 
 
 7
 The Claims. The Class Representatives' central claim is that the Casinos have engaged in "a course of fraudulent and misleading acts and omissions intended to induce people to play their video poker and electronic slot machines based on a false belief concerning how those machines actually operate, as well as the extent to which there is actually an opportunity to win on any given play." They argue that the Casinos:
 
 
 8
 have encouraged the public to perceive electronic gambling devices as true games of chance in which each individual play of the game is subject to determinable odds of winning; that the odds are the same on each individual play of the game; that the risk and the rules by which the machines operate do not vary among individual plays of the game; that the operator of the machine does not have the ability arbitrarily or selectively to affect whether a particular bet is won or lost to favor particular players over others; and that the operator of the game cannot know in advance when and how much a particular game will pay off.
 
 
 9
 The Class Representatives assert that, on the contrary, these "machines are operated by computer programs which determine, in advance, the outcome of each particular play." They also contend that the Casinos have perpetuated false perceptions through the appearance and labeling of the machines, advertising, promotional efforts, and concealment of information known to them that is not generally available or understandable to the public.
 
 
 10
 To put the claims in perspective, it is useful to have a general description of the two types of electronic gaming machines at issue in this case: video poker machines and electronic slot machines. Both types of machines are commonly found in land- and cruise ship-based casinos. Alleged differences between how the machines appear to function and how they actually function are at the core of the claims.
 
 
 11
 Unlike the traditional card game called "poker," which is played by a group of players using a conventional deck of cards, video poker is played by a single player who initiates play by depositing a coin in a video poker machine. The machine appears to "deal" five "cards" that are displayed on a video screen on the machine's face. The player then chooses whether to select and "discard" cards displayed onscreen and "draw" replacement cards by pressing a button, or to keep the "dealt" cards. The winning combinations — that is, the combinations that "pay off" by awarding a monetary prize — are similar to those favored in a traditional poker game, such as a pair, straight, full house, and flush. After the final "deal," the machine pays off winning combinations of cards by awarding coins according to a set schedule.
 
 
 12
 According to the Class Representatives, a key difference between video poker and traditional poker is that video poker machines do not replicate a random deal from a conventional deck of cards. Rather, a computer determines which cards will be "dealt" on an individual play, such that the results of individual plays are predetermined. Computerization of video poker machines makes them more predictable than traditional poker games and gives the manufacturers and casinos the ability to orchestrate and know in advance when and with what frequency a machine will "deal" a winning "hand."
 
 
 13
 Whereas video poker machines are loosely based on a traditional poker game, electronic slot machines are based on earlier mechanical slot machines, which were not computerized. Like their mechanical counterparts, electronic slot machines are played by a single player who initiates play by depositing a coin in the machine. After the deposit, the player may either pull a handle (like the mechanical slot machines require) or push a button. This action causes symbol-adorned reels displayed on the face of the machine to appear to spin as they do on the mechanical machines. Once the reels stop "spinning," the machine pays off by awarding coins according to a set schedule. Pay-offs appear to correspond to winning alignments of symbols on the "pay-off line."
 
 
 14
 The Class Representatives allege that, although the electronic slot machines are designed to appear to operate as did the mechanical slot machines of the past, they actually operate quite differently. The spinning of the mechanical reels causes a random alignment of symbols on the pay-off line, and the alignment itself triggers any pay-off. Thus, a player's chance of winning a pay-off on a mechanical slot machine is "equal to the random chance that the appropriate symbols on the reels [would] line up in a winning combination." For example, if a jackpot requires the alignment of three jokers on the pay-off line, a player's chance of winning a jackpot on the mechanical machine is determined "by how often a joker appears on each reel compared to other symbols."
 
 
 15
 The Class Representatives contend that, in stark contrast, a player's odds of winning a pay-off on an electronic slot machine depends on computer programming, not chance. A computer determines the pay-off and the corresponding appearance of the pay-off line on electronic slot machines, such that the computer-generated "spinning" of the reels has nothing to do with a player's chance of winning the game. Additionally, unlike in the mechanical game, where symbols appearing immediately above and below the pay-off line are symbols that the player "has just barely missed," in the electronic game, the machine operator can program the computer to generate "near misses" whenever and with whatever frequency desired. Operators can use this programming tactic to manipulate the psychology of the game by encouraging players to believe that they are just missing jackpots and, relatedly, that the odds of a jackpot are greater than they are. Yet, unlike in the mechanical game, "the chance of winning a jackpot (or, indeed, any prize)" from an electronic slot machine has nothing to do with the distribution of symbols on the reels but instead depends entirely on the sophisticated computer programming that predetermines the game's outcome.
 
 
 16
 Proposed Classes/Class Certification Denial. The Class Representatives propose two classes to litigate their claims, the "Video Poker Class" and "Electronic Slot Class," each with two subclasses — a "Card and Tournament Subclass" and a "Cruise Ship Subclass." The "Video Poker Class" and "Electronic Slot Class" are defined nearly identically, and together include:
 
 
 17
 All persons in the United States, other than directors, officers or employees of suppliers of ["video poker machines" or "electronic slot machines," respectively] or of casinos or persons acting in concert therewith, who have played defendants' ["video poker machines" or "electronic slot machines," respectively] during the period from January 1, 1988 to the present.
 
 
 18
 The "Card and Tournament Video Poker Subclass" and "Card and Tournament Electronic Slot Subclass" are also similar, and together include:
 
 
 19
 All persons in the United States, other than directors, officers, or employees of suppliers of ["video poker machines" or "electronic slot machines," respectively] or of casinos or persons acting in concert therewith, who have played defendants' ["video poker machines" or "electronic slot machines," respectively] during the period from January 1, 1988 to the present and who are readily identifiable, i.e., who used club cards to ["play video poker or who played in video poker tournaments" or "play the electronic slot machines," respectively].
 
 
 20
 The "Cruise Ship Video Poker Subclass" and "Cruise Ship Electronic Slot Subclass" are also similar, and together include:
 
 
 21
 All persons in the United States, other than directors, officers or employees of suppliers of ["video poker machines" or "electronic slot machines," respectively] or of cruise ship casinos or persons acting in concert therewith, who have played the Cruise Ship Casinos' ["video poker machines" or "electronic slot machines," respectively] during the period from January 1, 1988 to the present.
 
 
 22
 Altogether, the proposed classes "encompass[ ] hundreds of thousands, if not millions, of individuals who have played video poker or electronic slot machines."
 
 DISCUSSION
 I. SUBJECT MATTER J URISDICTION
 
 23
 As a threshold matter, we must "satisfy [ourselves] not only of [our] own jurisdiction, but also that of the lower court[] in [the] cause under review...." California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States, 215 F.3d 1005, 1009 (9th Cir.2000) (internal quotation marks omitted). This is so even in the context of an interlocutory appeal. See, e.g., Wong v. INS, 373 F.3d 952, 960-61 (9th Cir.2004) (holding that reaching issues of subject matter jurisdiction is necessary to ensure meaningful review of a qualified immunity ruling on interlocutory appeal); Isaacs v. Sprint Corp., 261 F.3d 679, 682-83 (7th Cir.2001) (holding that appellate court had jurisdiction and obligation to review district court's subject matter jurisdiction while reviewing interlocutory appeal of district court's denial of class certification motion).
 
 
 24
 Our jurisdiction to review the district court's class certification decision comes from Rule 23(f)(providing for interlocutory appeals of class certification decisions). The district court has jurisdiction over the underlying RICO action under 28 U.S.C. § 1331(providing jurisdiction over federal questions). A lingering, and more specific, issue is whether the district court lacked jurisdiction over the Class Representatives' claims vis-a-vis a subgroup of defendants — the cruise ship defendants — because the cruise ship defendants' alleged RICO violation occurred extraterritorially, beyond RICO's reach. This subgroup has raised the issue of subject matter jurisdiction in this narrow context.
 
 
 25
 We need not delve too deeply into the question of extraterritoriality as a jurisdictional matter; rather, we need only assure ourselves that "[a] cause of action under our law was asserted here," Lauritzen v. Larsen, 345 U.S. 571, 575, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) — that is, that the claim does not "appear[ ] to be immaterial and made solely for the purpose of obtaining jurisdiction" and is not "wholly insubstantial and frivolous." Bell v. Hood, 327 U.S. 678, 682-83, 66 S.Ct. 773, 90 L.Ed. 939 (1946). As we have explained, "when a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiffs' substantive claim for relief, a motion to dismiss for lack of subject matter jurisdiction rather than for failure to state a claim is proper only when the allegations of the complaint are frivolous." Timberlane Lumber Co. v. Bank of Am., 549 F.2d 597, 602 (9th Cir.1976).[2]
 
 
 26
 To resolve subject matter jurisdiction, we must address, to some extent, the bounds of RICO's extraterritorial application. We are led to this analysis because at least some of the alleged fraudulent conduct on which the Class Representatives base their claims against the cruise ship defendants occurred on cruise ships plying international waters. Applying the "conduct" and "effects" tests from Grunenthal GmbH v. Hotz, 712 F.2d 421, 424 (9th Cir.1983), the district court determined that, because the Class Representatives alleged that the Casinos (including the cruise ship defendants) engaged in substantial fraudulent activity in the United States involving and affecting United States citizens and commerce, the Class Representatives adequately alleged subject matter jurisdiction over the cruise ship defendants. We agree.
 
 
 27
 RICO itself is silent as to its extraterritorial application. Although the RICO and the securities fraud contexts are not precisely analogous, the tests used to assess the extraterritorial application of the securities laws provide useful guidelines for evaluating whether the jurisdictional minimum exists — particularly in cases such as this one, where comity concerns arising out of a foreign government's interest in the action are too peripheral to impact our threshold jurisdictional inquiry. See, e.g., Butte Mining PLC v. Smith, 76 F.3d 287, 291(9th Cir.1996) (holding, with respect to extraterritorial application of RICO, that "[o]nce the securities fraud claim was dismissed [for lack of extraterritorial jurisdiction under the "conduct" and "effects" tests,] the wire and mail fraud and RICO claims that related to this fraud had to be dismissed as well"); Republic of the Philippines v. Marcos, 862 F.2d 1355, 1358 (9th Cir.1988) (en banc) (holding that court had jurisdiction over RICO claim where "[t]he effect on the commerce of the United States of engaging in [the fraud was] palpable" and "[t]he criminal enterprise which [the defendants were] charged with conducting consisted in operations taking place within the United States ... [that] had multiple effects on the domestic and foreign commerce of this country"); N.S. Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1051-52 (2d Cir.1996) (looking to the "conducts" and "effects" tests for "guidance" in assessing RICO's extraterritorial reach, but declining to engage in the "delicate work" of "specifying the test for the extraterritorial application of RICO"); Hotz, 712 F.2d at 424 (applying the "conduct" and "effects" tests in the securities fraud context); see also Timberlane, 549 F.2d at 613-15 (providing a tripartite test for assessing the extraterritorial reach of our antitrust laws that looks at additional factors, including comity concerns).
 
 
 28
 Here, the Class Representatives' central claim is that the Casinos, including the cruise ship defendants, "have engaged in a course of fraudulent and misleading acts and omissions intended to induce people to play their video poker and electronic slot machines based on a false belief concerning how those machines actually operate, as well as the extent to which there is actually an opportunity to win on any given play." According to the Class Representatives, much of this fraud occurred within the United States and affected the United States. For example, they allege that the design, manufacture, and marketing of the video poker and electronic slot machines occurred in the United States; that the Casinos solicited business within the United States; and that the Casinos used the United States mail to further their fraudulent scheme. The Class Representatives also allege that this fraudulent conduct affected United States commerce by targeting United States citizens and employing gaming machines from United States distributors. Among other things, the complaint states:
 
 
 29
 Each of the enterprises [including the cruise ship defendants and their suppliers and distributors] engage in, and their activities affect, interstate commerce. Among other things, defendants transport gaming machines and transact business through interstate travel, the mail, and by telephone and telecopier. Defendants advertise video poker and electronic slot machines, and promote interstate travel to casinos and cruise ships for the purpose of playing those machines, through radio, telemarketing, mass mailings, television, magazine and newspaper advertisements, and promotions disseminated throughout the United States.
 
 
 30
 If these claims are true — and we must assume that they are at this early stage in the litigation — then the Class Representatives have alleged civil RICO claims against the cruise ship defendants based on acts that evidence a clear connection between the alleged fraud and United States interests. Because the Class Representatives have satisfied the jurisdictional minimum by stating "[a] cause of action under our law" that is neither "wholly insubstantial" nor "frivolous," Bell, 327 U.S. at 682-83, 66 S.Ct. 773; Timberlane, 549 F.2d at 602, we turn to the decision that forms the basis of this interlocutory appeal — the district court's denial of the class certification motion.
 
 II. CLASS CERTIFICATION
 
 31
 In denying the class certification motion, Judge Hunt determined that the Class Representatives satisfied four of the threshold requirements for class certification under Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. He held that they failed, however, to meet the two additional requirements for class certification under Rule 23(b)(3): predominance and superiority. We review these determinations under an abuse of discretion standard. Molski v. Gleich, 318 F.3d 937, 946-47 (9th Cir.2003).
 
 
 32
 Rule 23(b)(3) requires, among other things, "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." We conclude that the district court did not abuse its discretion in determining that individualized reliance issues related to proof of causation would predominate over common questions were the parties to litigate this case as a class action. Consequently, we need not reach the superiority issue raised by the Class Representatives or the Casino's challenge to the finding of "adequacy of representation" under Rule 23(a).
 
 A. CAUSATION
 
 33
 Causation lies at the heart of a civil RICO claim. Lumping claims together in a class action does not diminish or dilute this requirement. It is well settled that, to maintain a civil RICO claim predicated on mail fraud, a plaintiff must show that the defendants' alleged misconduct proximately caused the injury. Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); Oki Semiconductor Co. v. Wells Fargo Bank, 298 F.3d 768, 773 (9th Cir.2002); Forsyth v. Humana, Inc., 114 F.3d 1467, 1481 (9th Cir.1997). In some cases, reliance may be "a milepost on the road to causation." Blackie v. Barrack, 524 F.2d 891, 906 n. 22 (9th Cir.1975); see also Forsyth, 114 F.3d at 1481(noting that the "class had to establish that they relied on misrepresentations in buying their insurance policies, and that these misrepresentations caused them a concrete financial loss"). This case fits that description to a tee.
 
 
 34
 The misrepresentations standing alone have little legal significance. To connect the dots between the bare allegations and the injury, the class needs something more. Here, reliance provides a key causal link between the Casinos' alleged misrepresentations and the Class Representatives' injury. For example, the Class Representatives allege that "[v]ideo poker machines are designed in their appearance and labelling and represented and advertised to the public as replicating random shuffling of a standard... deck ... followed by a deal and a draw from such a deck," when in fact the machines do not use cards and do not operate in the manner of a card game. Even taking the Class Representatives' allegations as true, however, and assuming that all plaintiffs in the proposed classes suffered financial loss or other concrete injury as a consequence of playing the machines, it does not necessarily follow that plaintiffs' injuries are causally linked to the Casinos' alleged misrepresentations. In this case, individualized reliance issues related to plaintiffs' knowledge, motivations, and expectations bear heavily on the causation analysis.
 
 
 35
 Due to the unique nature of gambling transactions and the allegations underlying the class claims, this is not a case in which there is an obvious link between the alleged misconduct and harm. Rather, linking the Casinos' alleged misrepresentations to plaintiffs' losses requires forging a chain of inferences that, viewed together, amount to individualized reliance.
 
 
 36
 Instead of treating this proposition in the abstract, it is instructive to illustrate the point with some concrete examples of how a claim might play out. A plaintiff claiming that the Casinos' misrepresentations caused her to play electronic slot machines and suffer losses must do more than merely allege causation; she must draw a causal link between the alleged fraud and the alleged harm. The plaintiff might draw this link by proving that the Casinos' failure to inform players that the electronic slot machines operate differently than their mechanical counterparts affected her decision to play, or that she was influenced by the fact that electronic slot machines look like traditional slot machines. In turn, this would require her to establish that she was aware of how the mechanical slot machines operated, was unaware that the electronic slot machines operated differently than those machines, and was motivated to play the electronic slot machine based on her knowledge of these factors. Similarly, a plaintiff alleging losses stemming from misrepresentations related to the video poker machines might draw a causal link by establishing that she was an ace player in the traditional table poker game and played the video poker game, at least in part, because she was misled into believing that the video poker and table poker games functioned similarly and offered the same odds. It is not enough to say, "I played the games and I lost money," or "I didn't make any money."
 
 
 37
 What these examples make clear is the rather obvious point that gambling is not a context in which we can assume that potential class members are always similarly situated. Gamblers do not share a common universe of knowledge and expectations — one motivation does not "fit all." Some players may be unconcerned with the odds of winning, instead engaging in casual gambling as entertainment or a social activity. Others may have played with absolutely no knowledge or information regarding the odds of winning such that the appearance and labeling of the machines is irrelevant and did nothing to influence their perceptions. Still others, in the spirit of taking a calculated risk, may have played fully aware of how the machines operate. Thus, to prove proximate causation in this case, an individualized showing of reliance is required.
 
 
 38
 Because it is neither necessary nor prudent to reach the issue of whether reliance is the only way plaintiffs can establish causation in a civil RICO claim predicated on mail fraud, we decline to do so.[3] Rather, we note that our holding is both narrow and case-specific, and that we have been careful to frame the controlling issue in terms of causation, not reliance. Our approach is in keeping with Holmes, 503 U.S. at 272-73 n. 20, 112 S.Ct. 1311, in which the Supreme Court held that the "by reason of" requirement of 18 U.S.C. § 1964(c) is satisfied by a showing of proximate cause but declined to make a more sweeping pronouncement. As the unique facts of this case demonstrate, "the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case." Id.
 
 B. PRESUMPTION OF RELIANCE
 
 39
 As a fallback position, the Class Representatives argue that they are entitled to a presumption of reliance in a civil RICO action predicated on mail fraud. Because the claims at issue in this case would preclude such a presumption, even if the presumption could extend to the civil RICO context, we do not address this issue of first impression.
 
 
 40
 The shortcut of a presumption of reliance typically has been applied in cases involving securities fraud and, even then, the presumption applies only in cases primarily involving "a failure to disclose" — that is, cases based on omissions as opposed to affirmative misrepresentations. See Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (holding, in context of alleged violation of SEC Rule 10b-5, that presumption of reliance applies where case primarily involves "a failure to disclose"); Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir.1999) (holding, in context of alleged violation of SEC Rule 10b-5, that a presumption of reliance "should be confined to cases that primarily allege omissions"). Although the Class Representatives urge us to follow the analysis of these securities cases, their claims are best characterized as either affirmative misrepresentations or "mixed claims" — claims that, in any event, would not be entitled to the presumption.
 
 
 41
 The Class Representatives concede that their video poker machine claims are not primarily claims of omission. Instead, the argument underlying these claims is that the Casinos have affirmatively mislabeled the video poker machines with statements like "52-card deck," "shuffle," and "draw." This argument pushes the claims outside Binder's presumption of reliance.
 
 
 42
 The electronic slot machine claims suffer the same fate. The Class Representatives vigorously argue that their core claim is that the Casinos represent the electronic slot machines as operating like their older mechanical counterparts when, in fact, they operate differently. For example, like the mechanical slot machines, the electronic slot machines display spinning reels adorned with symbols. Unlike the mechanical slot machines, however, the "spinning" of the reels on the electronic machines does not determine the outcome of the play — a programmable computer does.
 
 
 43
 The Class Representatives nonetheless attempt to transform alleged affirmative misrepresentations into omissions, arguing that the Casinos "omit" the material information that the machines operate differently. This argument greatly oversimplifies the electronic slot machine claims. We need look no further than the complaint to conclude that, at best, the electronic slot machine claims are mixed claims based on both affirmative misrepresentations and omissions. As stated in the complaint, the representations at issue are both "express and implied." We acknowledge that there often is a fine line between these two concepts, but we do not need to split hairs in this case. Essentially, the Class Representatives contend that, to no small extent, it is the trade dress of the electronic slot machines that makes them misleading — for example, the affirmative placement of symbols on the reels and the affirmative advertisement of the opportunity to "buy" more than one "line" at a time by placing additional coins in the machine. That the machines neglect to specify that they operate differently than their older mechanical counterparts is but one part of a much broader claim. Simply put, the Class Representatives' claims are based as much on what is there as what is purportedly missing.
 
 
 44
 In Binder, we held "that the Affiliated Ute presumption should not be applied to cases that allege both misstatements and omissions unless the case can be characterized as one that primarily alleges omissions." Binder, 184 F.3d at 1064. Because the allegations here cannot be characterized primarily as claims of omission, the Class Representatives are not entitled to Binder's presumption of reliance.
 
 C. CIRCUMSTANTIAL EVIDENCE
 
 45
 The Class Representatives' second fallback position is that reliance can be proven through classwide circumstantial evidence, such that individualized reliance issues related to causation would not predominate. At bottom, this argument is a variation on both the causation and presumption of reliance themes. The suggestion that "common sense" links the act of a player's falling for the misrepresentations or omissions on the machines to the ensuing loss is just another effort to avoid the necessary proof of causation.
 
 
 46
 We are not persuaded by the Class Representatives' argument that the gambling transactions here are analogous to the transactions at issue in Garner v. Healy, 184 F.R.D. 598 (N.D.Ill.1999). In Garner, the district court certified a class of consumers who purchased a substance represented as "car wax" that allegedly contained no wax, holding that the alleged fraud "was perpetrated in a uniform manner against members of the class," such that individual reliance issues would not predominate. Id. at 602 (internal quotation marks omitted). The court quite sensibly concluded that "if Plaintiffs paid money for a `wax,' but instead received a worthless `non-wax' product, then issues of proximate cause would be relatively simple to resolve on a classwide basis." Id.
 
 
 47
 Similarly, the Class Representatives cite to Peterson v. H & R Block Tax Services, Inc., 174 F.R.D. 78 (N.D.Ill.1997), in which a district court certified a consumer class that allegedly was induced by representations presented in standard documents to purchase tax refund services for which the class members were ineligible. The court concluded: "It is inconceivable that the class members would rationally choose to pay a fee for a service they knew was unavailable.... The only logical explanation for such behavior is that the class members relied on [defendants'] representation that they could take advantage of [the service] by paying the requisite fee." Id. at 85. No such "common sense" or "logical explanation" serves to link the gambling patrons and their use of gaming machines.
 
 
 48
 Indeed, there may be no single, logical explanation for gambling — it may be an addiction, a form of escape, a casual endeavor, a hobby, a risk-taking money venture, or scores of other things. The vast array of knowledge and expectations that players bring to the machines ensures that the "value" of gambling differs greatly from player to player, with some people playing for "entertainment value" or for any number of other reasons as much as to win. Consequently, we conclude that classwide circumstantial evidence would not suffice to prove causation in this case.
 
 III. PENDENT APPELLATE JURISDICTION
 
 49
 Finally, we turn to the Casinos' invitation to review a host of other rulings — beyond the class certification decision — under the doctrine of pendent appellate jurisdiction. Rule 23(f) provides that "[a] court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order." With interim review, which is the exception not the norm, secured under Rule 23(f), the Casinos ask us to exercise pendent appellate jurisdiction over rulings that do not independently qualify for interlocutory review, including the district court's denial of the Casinos' motions to dismiss or stay the action on the grounds of Burford abstention, primary jurisdiction, and personal jurisdiction over subgroups of defendants.
 
 
 50
 Although the analysis is slightly different for each of the Casinos' challenges, the guiding principles remain the same: We may exercise "pendent appellate jurisdiction" only over rulings that are "inextricably intertwined" with or "necessary to ensure meaningful review of" decisions that are properly before us on interlocutory appeal, and we "should exercise restraint in reviewing on interlocutory appeal otherwise non-appealable orders...." Meredith v. Oregon, 321 F.3d 807, 812 (9th Cir.2003) (citing Swint, 514 U.S. at 50, 115 S.Ct. 1203), amended by 326 F.3d 1030 (9th Cir.2003); see also Cunningham v. Gates, 229 F.3d 1271, 1284-85 (9th Cir.2000).
 
 
 51
 Upon close inspection, the issues raised by the Casinos beg us to exercise not jurisdiction but restraint. Would the Casinos prefer a host of definitive appellate rulings now? Of course. But such preferences are usually present when a defendant loses a motion to dismiss, whether on jurisdictional grounds or otherwise. Our longstanding rule against piecemeal appeals trumps convenience and expedience for the parties. Because the challenged rulings do not meet the Supreme Court's test for pendent appellate jurisdiction, we decline the Casinos' overture to turn this focused interlocutory appeal of a class certification denial into a "multi-issue interlocutory appeal ticket[ ]." Swint, 514 U.S. at 50, 115 S.Ct. 1203.
 
 A. GUIDING PRINCIPLES
 
 52
 Meeting Swint's requirements for pendent appellate jurisdiction presents a very high bar. Rare is the ruling that is "inextricably intertwined" with or "necessary to ensure meaningful review of" decisions that are properly before us on interlocutory appeal. Id. at 51, 115 S.Ct. 1203. A brief overview of our Swint-related jurisprudence illustrates just how narrow the realm of pendent appellate jurisdiction really is.
 
 
 53
 Significantly, "[w]e have narrowly construed Swint's `inextricably intertwined' prong. Two issues are not `inextricably intertwined' if we must apply different legal standards to each issue. Rather, the legal theories on which the issues advance must either (a) be so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal, or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." Meredith, 321 F.3d at 813-14(internal quotation marks and citations omitted).
 
 
 54
 Swint's second prong — that review is "necessary to ensure meaningful review of" the class certification decision — is similarly restrictive. It requires that the pendent decision have much more than a tangential relationship to the decision properly before us on interlocutory appeal. Swint, 514 U.S. at 51, 115 S.Ct. 1203.
 
 
 55
 Our recent decision in Meredith provides us with a nuanced view of pendent appellate jurisdiction in the context of an interlocutory appeal. In that case, we concluded that review of the Younger abstention[4] decision was "necessary to ensure meaningful review of" the district court's preliminary injunction decision. Meredith, 321 F.3d. at 815. We also made clear that our holding was extremely narrow and fact-specific. Id. at 816.
 
 
 56
 Importantly, Meredith involved a unique factual context, in which a district court's actions had the potential to seriously alter the relationship between the parties and directly interfere with a state court proceeding. Specifically, the Oregon Department of Transportation ordered Meredith to take down a sign on his property on the ground that it violated a state statute requiring an annual permit. Meredith began a series of challenges to the related enforcement action, ultimately securing administrative, state court, and federal district court review. Id. at 810-11. After the administrative law judge ("ALJ") held that state law required Meredith to remove the sign, id. at 811, and the state court denied Meredith a stay of enforcement of the ALJ's decision, the federal district court granted Meredith's motion for a preliminary injunction enjoining the state from enforcing the statute against Meredith. Id. The district court also denied the state's motion to dismiss or stay the action on Younger abstention grounds. Id. The upshot of Meredith's seeking parallel review of the issue in state and federal forums was that the state court decision requiring enforcement of the ALJ's final order stood in direct conflict with the federal district court decision enjoining that enforcement.
 
 
 57
 After a detailed Swint analysis, we held that, although the issues were not "inextricably intertwined," review of the Younger abstention decision was necessary to meaningful review of the preliminary injunction decision. Id. at 811-16. Emphasizing the intrinsic link between the district court's preliminary injunction and Younger abstention decisions, we reasoned that, "[l]ike subject matter jurisdiction and qualified immunity, ... resolution of the Younger abstention issue is critical because, if the district court is required to abstain under Younger and dismiss the suit, then it has no authority to rule on a party's motion for a preliminary injunction." Id. at 816.
 
 
 58
 In deciding this issue, we acknowledged the Supreme Court's reluctance "`to expan[d][ ] the scope of an interlocutory appeal.'" Id. at 812 (quoting Swint, 514 U.S. at 50, 115 S.Ct. 1203). Accordingly, we took pains to cabin our holding to the unique facts of Meredith, "hold[ing] that in cases such as this, in which a district court denies a motion to dismiss on the basis of Younger abstention and then grants injunctive relief that potentially interferes with ongoing state proceedings, review of the court's Younger abstention decision is `necessary to ensure meaningful review of' the grant of the preliminary injunction." Id. at 816 (emphasis added). With these parameters in mind, we turn to the various issues on which the Casinos seek interlocutory review.
 
 B. PRIMARY JURISDICTION DOCTRINE
 
 59
 The Casinos first ask us to exercise jurisdiction over the denial of their motion to dismiss or stay the underlying action on primary jurisdiction grounds. Primary jurisdiction "is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts." Syntek Semiconductor Co. v. Microchip Tech., Inc., 307 F.3d 775, 780 (9th Cir.2002). The gist of the Casinos' argument is that federal statutes implementing the Tenth Amendment consign regulation of gaming devices to the states, which have, in turn, delegated the matter to state agencies. Accordingly, state agencies, not federal courts, have initial responsibility for deciding the issues raised by this case.
 
 
 60
 The class certification and primary jurisdiction decisions turn on wholly different factors. Class certification hinges on the well known factors from Rule 23 — namely, whether there is numerosity, typicality, commonality, adequacy of representation, predominance, and superiority. The primary jurisdiction doctrine, on the other hand, asks us to determine whether there is: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." United States v. Gen. Dynamics Corp., 828 F.2d 1356, 1362 (9th Cir.1987). Because the primary jurisdiction and class certification issues require application of different legal standards and advance on different legal theories, they are not "inextricably intertwined."
 
 
 61
 Nor are we compelled to address primary jurisdiction at this stage of the litigation in order to resolve the class certification issue.[5] None of the factors we identified as central to our jurisdiction in Meredith is present here.
 
 C. BURFORD ABSTENTION DOCTRINE
 
 62
 The Casinos also seek review of the denial of their motion to stay or dismiss the action on Burford abstention grounds. Burford abstention "is concerned with protecting complex state administrative processes from undue federal interference." Tucker v. First Md. Sav. & Loan, Inc., 942 F.2d 1401, 1404 (9th Cir.1991) (internal quotation marks omitted). Where applicable, Burford abstention normally requires a court to dismiss an action, Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and is only appropriate where:
 
 
 63
 (1) ... the state has concentrated suits involving the local issue in a particular court; (2) the federal issues are not easily separable from complicated state law issues with which the state courts may have special competence; and (3) ... federal review might disrupt state efforts to establish a coherent policy.
 
 
 64
 Tucker, 942 F.2d at 1405. Because the legal standard set forth in Tucker bears no similarity at all to class certification analysis, the first prong of Swint provides us with no jurisdictional basis over the Casino's Burford abstention claim.
 
 
 65
 Neither is the Burford abstention issue "necessary for meaningful review of" the class certification decision. Burford abstention is slightly more like Younger abstention than the primary jurisdiction doctrine, because both Burford and Younger abstention guard against federal interference with state proceedings. However, because the focus of Swint and Meredith is on the interrelatedness of the pendent decision and the decision before the court on interlocutory appeal, this similarity does not affect the Swint analysis here. The Casinos cite to no pending administrative claim or process; nor do they explain how our certification analysis hinges on or impugns the Burford question. Review of the Burford abstention issue implicates entirely different issues than review of the class certification issue, does not potentially pit a federal court's decision against an ongoing state proceeding, and does not otherwise fit the narrow mold of Swint or Meredith.[6]
 
 D. PERSONAL JURISDICTION
 
 66
 We also decline to review the district court's exercise of personal jurisdiction over the non-Nevada defendants — jurisdiction the Casinos challenge on the grounds that the alleged harm occurred outside of Nevada and the Class Representatives failed to adequately allege a single nationwide conspiracy.
 
 
 67
 As in the contexts previously discussed, the personal jurisdiction issue and class certification decision involve the application of different standards, such that Swint's "inextricably intertwined" prong provides us with no jurisdictional traction. Compare Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 411-419 (9th Cir.1977) (engaging in personal jurisdiction analysis), with FED. R.CIV. PRO. 23(b)(3) (setting forth class certification analysis).
 
 
 68
 Swint's second prong presents only a slightly more difficult question. Importantly, the Casinos challenge personal jurisdiction as to only a subgroup of defendants. Thus, the district court would have retained jurisdiction over the class certification decision regardless of whether it asserted personal jurisdiction over the non-Nevada defendants. And, as in the previous contexts, the district court's personal jurisdiction and class certification decision are only tangentially related, such that we lack jurisdiction to evaluate the district court's personal jurisdiction decision in the context of this Rule 23(f) appeal.
 
 
 69
 In sum, we affirm the district court's denial of the Class Representatives' class certification motion and dismiss for lack of jurisdiction the Casinos' claims involving the district court's denials of their motions to dismiss or stay the action on the grounds of Burford abstention, the primary jurisdiction doctrine, and the district court's personal jurisdiction over subgroups of the Casino defendants. This appeal is AFFIRMED IN PART, AND DISMISSED IN PART. Each party shall bear its own costs.
 
 
 
 Notes:
 
 
 [1]
 Further references to "Rules" refer to Federal Rules of Civil Procedure
 
 
 [2]
 We acknowledge that it is not always clear whether a so-called "jurisdictional" challenge is really just "a contention that there is some barrier to granting plaintiff's claim ... cast in terms of an exception to jurisdiction of subject matter."Lauritzen, 345 U.S. at 575, 73 S.Ct. 921. At times, determining whether an issue is properly characterized as jurisdictional versus bearing on the merits of a claim resembles the age-old "chicken and egg" problem — it is not always apparent which comes first. We take our cue from the Supreme Court in performing only that minimum degree of analysis that is necessary to assure ourselves that the Class Representatives assert a cause of action that arises under federal law. Bell, 327 U.S. at 681-83, 66 S.Ct. 773. Whether the cause of action turns out to be "well founded in law and fact," Lauritzen, 345 U.S. at 575, 73 S.Ct. 921, on the other hand, is beyond the scope of our threshold jurisdictional review.
 
 
 [3]
 Our sister circuits have split on this issueCompare Sikes v. Teleline, Inc., 281 F.3d 1350, 1359-60 (11th Cir.2002) (requiring that "when a plaintiff brings a civil RICO case predicated upon mail or wire fraud, he must prove that ... he relied to his detriment on misrepresentations made in furtherance of that scheme") (internal quotation marks omitted), cert. denied, 537 U.S. 884, 123 S.Ct. 117, 154 L.Ed.2d 143 (2002), and County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1311 (2d Cir.1990) (requiring demonstration of reliance in Civil RICO claims predicated on mail fraud), and Brandenburg v. Seidel, 859 F.2d 1179, 1188 n. 10 (4th Cir.1988) (holding that "reliance is necessary to establish injury to business or property `by reason of' a predicate act of mail fraud within the meaning of § 1964(c)"), overruled on other grounds by Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 731, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996), with Sys. Mgmt., Inc. v. Loiselle, 303 F.3d 100, 103-04 (1st Cir.2002) (reliance not required to prove civil RICO claim predicated on mail fraud).
 
 
 [4]
 Younger abstention is a common law equitable doctrine holding that a federal court generally should refrain from interfering with a pending state court proceeding. See, e.g., Meredith, 321 F.3d at 815 n. 8.
 
 
 [5]
 As an "aside" to their primary jurisdiction argument, the Casinos argue that the "filed-tariff" or "filed rate" doctrine is an "application" of the primary jurisdiction doctrine that supports their primary jurisdiction claim. "[T]he filed-rate doctrine (also called the filed-tariff doctrine) bars all claims — state and federal — that attempt to challenge the terms of a tariff that a federal agency has reviewed and filed."Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1170 (9th Cir.2002) (internal quotation marks and citations omitted). We decline jurisdiction over this claim for the same reasons articulated with respect to the Casinos' broader primary jurisdiction claim.
 
 
 [6]
 It bears noting that our resolution of this point is not at odds with the Fourth Circuit Court of Appeals' decision inJohnson v. Collins Entertainment Co., Inc., 199 F.3d 710, 718 & 719 n. 3 (4th Cir.1999) (holding that Burford abstention decision was reviewable on interlocutory appeal of a district court's injunctive order "impos[ing] on defendants an extensive set of requirements as an `enforcement mechanism'"). In that case, unlike in this one, the district court's injunction interfered with state gaming policies, such that the abstention and injunction issues were closely related. Indeed, Johnson was much more like Meredith than this case.